**In re: RAINMAKER CAPITAL OF CHESTNUTHILL, LLC.**

**Appeal of: Chestnuthill Township Board of Supervisors.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 1, 2011.

Decided June 15, 2011.

Joseph P. McDonald, Stroudsburg, for appellant.

C. William Shilling, Stroudsburg, for appellee.

BEFORE: PELLEGRINI, Judge, and SIMPSON, Judge, and BUTLER, Judge.

OPINION BY Judge SIMPSON.

In this factually complicated local agency appeal, the Chestnuthill Township Board of Supervisors (Supervisors) asks whether the Court of Common Pleas of Monroe County (trial court) erred in reversing the Supervisors' denial of Rainmaker Capital of Chestnuthill LLC's (Developer) application for a sewage "repair" permit. Essentially, the Supervisors ar-

gue the trial court exceeded its standard of review in granting the permit where the Supervisors' reasons for denying the permit were adequately supported, and the trial court took no additional evidence. Upon review, we reverse the trial court's order and reinstate the Supervisors' decision.

Developer owns a small shopping center known as Regency Plaza, which is located at the northeast corner of State Route 209 and Weir Lake Road in Chestnuthill Township (Township), Monroe County. Regency Plaza was constructed around 1987. At that time, Regency Plaza consisted of one "L" shaped building, off-street parking and two on-site sewage systems.

In March 2007, one of two sewage systems serving Regency Plaza malfunctioned. Helen Beers, the Township's sewage enforcement officer (SEO), made an appointment to investigate the malfunctioning sewage system. Stephen Gitch, acting on behalf of Developer, met the SEO at Regency Plaza to investigate the cause of the malfunctioning sewage system. At that time, Gitch asked the SEO not to issue an enforcement notice, but rather to allow Regency Plaza's tenants to use another existing, smaller on-site sewage system while Developer developed plans for a new off-site system on a separate lot, 300 feet away.

In June 2007, prior to constructing the new off-site sewage system, Developer submitted a new preliminary land development plan for Regency Plaza to the Township. The new plan proposed a new free-standing Dunkin' Donuts store. Significantly, the new plan contemplated additional parking in the location of the existing, malfunctioning sewage system. The new plan also proposed relocating the existing primary sewage system to an off-site location, which is located on the north side

of Veronia Lane, to the rear of Regency Plaza. The Township granted conditional approval of Developer's preliminary plan in October 2007.

In February 2008, Developer submitted a new sewage planning module to the Pennsylvania Department of Environmental Protection (DEP) in order to relocate the sewage system. Important for our analysis, DEP subsequently approved the planning module, clearing the way for Developer to submit a design permit to DEP for approval prior to relocation of the sewage system.

Several months later, Developer and the Township entered into an agreement (Agreement) in which the Township agreed to issue a zoning permit and a building permit to allow construction of the proposed Dunkin' Donuts. Reproduced Record (R.R.) at 63a. The parties also agreed Developer could temporarily use the smaller, non-malfunctioning on-site sewage system, subject to Developer's agreement to relocate the sewage system to the off-site location upon final DEP approval. R.R. at 62a. The Agreement also required Developer to submit a final land development plan prior to the issuance of a certificate of occupancy for the Dunkin' Donuts. R.R. at 65a.

In March 2009, Developer submitted a final land development plan to the Township Planning Commission. The final plan contemplated the placement of off-street parking at the location of the malfunctioning on-site sewage system. Thereafter, Developer constructed the Dunkin' Donuts.

Then the real complications began. Sometime between March and June 2009, Developer decided *not* to pursue construction of the new, off-site sewage system on the north side of Veronia Lane. Developer's engineer, Eric Snyder, P.E. (Develop-

er's Engineer), informed the SEO that Developer was considering withdrawing its request to DEP to relocate the sewage system to the off-site location. Certified Record (C.R.), Supervisors' Hr'g of 11/23/09, Notes of Testimony (N.T.) at 26. Thereafter, Developer submitted a *revised* final land development plan that eliminated the off-site sewage system. Instead, the *revised* final land development plan proposed reconstruction of the malfunctioning on-site sewage system *in the area Developer previously proposed for off-street parking.*

In July 2009, Developer filed an application with the Township seeking an on-lot sewage system "repair" permit in order to gain approval to repair the malfunctioning system. R.R. at 60a. Shortly thereafter, the SEO sent Developer a letter explaining the permit application was incomplete. R.R. at 94a. Among other things, the SEO requested documentation regarding the status of Developer's previously filed permit application with DEP as required by the approved planning module. *Id.*

In response, Developer's Engineer sent the SEO a letter indicating DEP had issued a "verbal rejection" of Developer's "revised" permit application, and Developer would forward a written rejection of the permit application when it received it from DEP. C.R., Hr'g of 11/23/09, at SEO Ex. 12.

Shortly thereafter, the SEO sent Developer a second letter explaining Developer's application was still incomplete. R.R. at 95a. Specifically, that letter stated: "The plan submitted with your repair application is not a current plan of record." *Id.*

In response, Developer's Engineer sent the SEO a letter indicating the Township Planning Commission "re-classified" Developer's *revised* final land development plan as "revisions" to Developer's preliminary land development plan. C.R., Hr'g of 11/23/09 at SEO Ex. 14. Developer's Engineer further stated Developer only sought to rebuild a portion of the previously constructed septic system, which was depicted on a final land development plan for Regency Plaza that was recorded in 1987. *Id.* Developer's Engineer further stated, because the proposed septic flows for the current land development project were less than the previously approved flows for the entire Regency Plaza, he was unaware of any regulation that would prohibit reconstruction of the previously approved septic system. *Id.* Developer's Engineer enclosed a copy of the 1987 recorded land development plan for Regency Plaza.

In October 2009, through a third letter, the SEO again advised Developer that its application was incomplete. C.R., Hr'g of 11/23/09, at SEO Ex. 1. Specifically, the SEO identified the following deficiencies:

1. The plan submitted with your repair application is the approved plan from 1987 and does not reflect the as built "Dunkin['] Donuts[.]" The plan submitted with the Dunkin Donuts shown has no Land Use Approval.

2. We still have not received any information on the status of your state permit application from DEP.

*Id.* The SEO advised Developer of its right to request a hearing before the Supervisors. *See* 25 Pa.Code § 72.26(e) (person aggrieved by the action of a sewage enforcement officer in the denial of a permit, may within 30 days of receipt of notice of the action, file a written request for a hearing before the local agency). Developer requested a hearing. *See* 25 Pa.Code § 72.29(a), (b) (requiring local agency to hold hearing on permit denial within 30 days of receipt of written request; hearing and any subsequent appeal is required to

be conducted pursuant to Local Agency Law, 2 Pa.C.S. §§ 551–555).

About a month later, the Supervisors held a hearing at which the SEO testified. In addition, Developer presented the testimony of its Engineer and that of its representative, Stephen Gitch, who is also a certified sewage enforcement officer.

Thereafter, the Supervisors issued a decision in which they made the following pertinent determinations (with emphasis added):

6. [Developer] sought and obtained approval by DEP of the new planning module for land development for Regency Plaza during 2008.

7. *[The] Township approved the current planning module for land development for Regency Plaza based upon a septic design plan submitted with Regency Plaza's 2007 preliminary land development plan (see SEO exhibit no. 5). This plan calls for the piping, drainage and treatment of all sewage generated at Regency Plaza to an off-site location on the north side of Veronia Lane.*

8. *The proposed off-site treatment of Regency Plaza sewage is consistent with an agreement entered into by [Developer] and Chestnuthill Township in December 2008 (SEO Exhibit No. 13).*

9. *According to the 2008 agreement, [Developer] could not rebuild the 2950 gallon per day drain field at the prior location, the location in question in this hearing unless DEP denied the off-site permit location or as the result of a legal challenge[.]*

10. *Even if one of these events took place, [Developer] could not rebuild the 2950 gallon per day drain field unless it satisfied all appropriate ... Township ordinances.*

11. The question of whether [Developer] must complete the off-site sewage disposal location on the north side of Veronia Lane is one of the subjects of litigation in a declaratory judgment action initiated by [Developer] known as "Rainmaker Capital of Chestnuthill LLC v. Chestnuthill Township, Court of Common Pleas of Monroe County, No. 9357–Civil–2009".[1]

12. *Following the December 2008 agreement, [Developer] submitted a proposed final land development plan to the ... Township Planning Commission in March 2009. The proposed final land development plan proposed additional off-street parking for the same area now sought by [Developer] to rebuild the 2950 gallon per day drain field.*

13. *Sometime after March of 2009 and prior to June of 2009, [Developer] decided not to pursue construction of the new, off-site drain field on the north side of Veronia Lane; but instead revised its plan to rebuild a new drain field at the original site of the 2950 gallon per day system.*

1. In January 2010, the trial court sustained the Township's preliminary objections to Developer's declaratory judgment action and dismissed that action on the ground that it lacked subject matter jurisdiction over the action. Specifically, the trial court determined, based on the facts averred in Developer's complaint, no actual controversy yet existed between the parties. Developer subsequently appealed the trial court's dismissal of its complaint to this Court. Our review of Developer's appeal is the subject of our opinion in the separate, but related matter of *Rainmaker Capital of Chestnuthill, LLC v. Chestnuthill Twp.*, 23 A.3d 648 (Pa.Cmwlth., No. 205 C.D. 2010, filed June 15, 2011).

14. The net effect of [Developer's] current proposal is to side step the mandatory municipal planning module review procedure set forth at Title 25, Chapter 71.53 Municipal Administration of New Planning Requirements for Revisions. Specifically, each municipal planning agency and zoning officer shall complete Item **J PLANNING AGENCY REVIEW, COMPONENT 1, "SEWAGE FACILITIES PLANNING MODULE", DEP FORM 3800—FM—WSFR03S0.** *This Section requires the municipal planning agency and zoning officer to confirm that the planning module has been reviewed and found to be consistent or inconsistent with municipal zoning ordinances or subdivision or land development ordinances.* This is the Section that mandates municipal review of planning and zoning agencies of each proposed land development. *The purpose of this review is to insure that each proposed planning module satisfies local planning and zoning ordinances and criteria.*

15. *While [Developer] chose to caption its permit application as a "repair" permit, it is apparent to the [Supervisors] that [Developer] is attempting to replace and substitute its proposed new sewage treatment system on the north side of Veronia Lane (see SEO exhibit 5) with an alternate treatment system that happens to be located at the original site of the 2950 gallon treatment bed originally constructed in 1988 and removed from Regency Plaza sometime in 2007. (See SEO exhibit no. 6). The prob-*

*lem with this proposal is that the proposed 2950 gallon per day septic bed consumes the same area previously designated for 22 new off-street parking stalls (See SEO exhibit no. 5). By [Developer's] calculations the new septic bed location will contribute to an off-street parking deficit of 16 stalls (See SEO exhibit no. 6 Sheet 1 of 9). Upon review of the purposes and intent of the Clean Streams Law,* [2] *the Sewage Facilities Act, and the PA Administrative Code, Chapter 71, the [Supervisors], and the [SEO] are prohibited from issuing [Developer's] proposed permit because it fails to satisfy the consistency criteria of the planning module for land development.*

16. The SEO did not err in concluding, in her October 13, 2009 letter to [Developer] that [Developer's] application for a sewage permit was incomplete. To the contrary, *the SEO correctly determined that the preliminary land development plan for Regency Plaza approved by [the] Township in October 2007, together with the planning module proposed by [Developer], approved by [the] Township and DEP in 2008 governs the layout and development of Regency Plaza. Since [Developer] now proposes to alter its preliminary land development plan, to recognize not only the newly completed Dunkin' Donuts drive-thru [sic] structure but also a reduction in pre-existing off-site parking, [Developer] must satisfy all local zoning and subdivision land development and ordinance criteria, as otherwise set forth in the planning module. Since [De-*

*veloper] has not cured an existing off-street parking deficiency, then it would be contrary to the purpose and intent of the Sewage Facilities Act, the Clean Streams Law, and the Pennsylvania Administrative Code to grant Regency a permit at this time.*

Supervisors' Op. of 12/15/09, Concls. of Law Nos. 6–16. Thus, the Supervisors denied Developer's appeal from the SEO's decision. Developer appealed to the trial court.

Without taking additional evidence, the respected trial court reversed the denial of the repair permit, stating:

> The Township wants [Developer] to do more for the issuance of the sewage repair permit. However, we have no evidence that the Township['s] requests are based on any regulation or statute. Thus, we find the [Supervisors'] decision is arbitrary. The record does not reflect any rational reason to deny the sewage repair permit. Hence, we must conclude that the [Supervisors'] decision was illegal as a purely arbitrary exercise of [their] duties.
>
> We also find the [Supervisors'] finding[s] of fact[ ] are not supported by substantial evidence.... [T]he record fails to show any relevant evidence to uphold the SEO's denial of the repair permit.

Tr. Ct., Slip Op., 4/15/10, at 5–6. The Supervisors now appeal to this Court.

On appeal, the Supervisors argue the record adequately supports their decision to deny the sewage permit. The Supervi-

sors assert the SEO properly determined she was prohibited from issuing the permit based on the parties' Agreement regarding relocation of the sewage system, the 1987 recorded land development plan, which is the only plan of record for Regency Plaza, and Developer's 2008 planning module submitted to DEP.

The Supervisors further maintain the trial court exceeded its scope and standard of review in reversing the Supervisors' decision and granting the permit. The Supervisors argue that in doing so the trial court did not analyze each of the SEO's exhibits. These, viewed as a whole, provide substantial evidence for the SEO's decision and the Supervisors' findings and conclusions.[3]

■ In evaluating a local agency adjudication, where a complete record is made before the agency, a reviewing court shall hear the appeal on the record supplied, and shall affirm the local agency's adjudication unless it violates constitutional rights, is not in accordance with law, violates the statutory provisions governing practice and procedure before local agencies, or contains necessary findings that are not supported by substantial evidence. Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754(b); *In re Nevling*, 907 A.2d 672 (Pa.Cmwlth.2006).

As to the "in accordance with law" requirement, in *Leckey v. Lower Southampton Township Zoning Hearing Board*, 864 A.2d 593 (Pa.Cmwlth.2004), this Court explained:

> Although the "abuse of discretion" scope of review is not expressly provided

**3.** Several of the parties' arguments focus on the trial court's decision. As explained below, however, we review *the Supervisors' decision* to determine whether it committed an error of law and whether its necessary findings were supported by substantial evidence. *41 Valley Assocs. v. Bd. of Supervisors of Lon-*

*don Grove Twp.*, 882 A.2d 5 (Pa.Cmwlth. 2005). To the extent the parties' arguments focus on the trial court's decision rather than on the Supervisors' decision, which is the subject of our review, our analysis departs from those arguments. *Id.*

for in ... the Local Agency Law, it is included in the requirement that the agency decision be "in accordance with law." To be "in accordance with law," an agency's decision must not represent a manifest and flagrant abuse of discretion or a purely arbitrary execution of its duties or functions....

*Id.* at 596, n. 4 (citing *Slawek v. State Bd. of Med. Educ. & Licensure,* 526 Pa. 316, 586 A.2d 362 (1991)).

Pursuant to Section 7(a)(1) of the Pennsylvania Sewage Facilities Act: "No person shall ... repair ... an individual sewage system or community sewage system ... without first obtaining a permit indicating that the site and the plans and specifications of such system are in compliance with the provisions of this act and the standards adopted pursuant to this act." [4] Thus, Developer's request to repair the sewage system at issue here required a permit.

This Court previously recognized, albeit under prior DEP regulations, that municipalities possess broad discretion in requiring sufficient information to support the grant of a sewage permit. *See D'Amico v. Bd. of Supervisors, Twp. of Alsace,* 106 Pa.Cmwlth. 411, 526 A.2d 479 (1987). Current DEP regulations provide: "When sewage facilities are permitted by local agencies, the municipality is responsible for taking actions necessary to assure continued compliance of these sewage facilities with the [Sewage Facilities Act], The Clean Streams Law and regulations promulgated thereunder." 25 Pa.Code § 71.73(a). The regulations also state: "[t]he local agency may require additional information consistent with the [Sewage Facilities Act] needed to assure that the system or the site will comply with the requirements of the act and this part." 25

Pa.Code § 72.24(b). The regulations require a local agency to issue a permit when it "has determined that *the application is complete* and meets the requirements of the [Sewage Facilities Act] and this part." 25 Pa.Code § 72.25(a) (emphasis added). Thus, under current DEP regulations, municipalities retain discretion in the sewage permitting process, including the discretion in requiring sufficient information to support the grant of a sewage permit. *Id.* Such municipal discretion is akin to what our Supreme Court holds are the "inherent discretionary powers" that municipalities possess in reviewing land development plans. *Kassouf v. Twp. of Scott,* 584 Pa. 219, 239, 883 A.2d 463, 476 (2005).

■ Exercising their discretion here, the Supervisors denied Developer's sewage repair permit application for essentially two reasons. First, the Supervisors determined that Developer's request to rebuild the malfunctioning sewage system was inconsistent with the 2008 Agreement between the Township and Developer, through which Developer agreed to construct a new off-site sewage system. Second, the Supervisors determined Developer's *revised* final land development plan, which was at odds with Developer's approved preliminary land development plan and its approved sewage planning module, violated the Township's ordinances because it did not propose sufficient off-street parking. As such, the Supervisors determined the SEO properly exercised her discretion in determining Developer's sewage repair permit application was incomplete. For the reasons set forth below, we discern no abuse of discretion in the Supervisors' decision.

First, under the terms of the 2008 Agreement, Developer agreed to construct a sewage system at the new off-site Vero-

---

**4.** Act of January 24, 1966, P.L. (1965) 1535, *as amended,* 35 P.S. § 750.7(a)(1).

nia Lane location unless DEP denied design permit approval or "an objecting party" prevented construction and use of the new system. R.R. at 61a, 64a; Concls. of Law Nos. 8–10. Developer does not assert that either of these events occurred.

As to the impact of the Agreement on her decision not to issue the sewage repair permit, the SEO offered the following testimony:

Q. *Is there an outstanding agreement with the [T]ownship regarding locating [Developer's] septic system on the Veronia Drive location?*

A. *Yes, there is.*

Q. Has that impacted your decision making in this matter?

A. Honestly, that's a legal question. I don't know.

Q. Have you considered it as part of the—

A. *I've thought about it, absolutely. Yeah, I don't—I'm between a rock and a hard place.*

Q. Why is that?

A. Well, I'm just not—there's so many peripheral issues. *There's an agreement with the [T]ownship.* I really don't know until I get legal counsel how that's going to impact me. I don't know if that is going to impact me. *We've got the State which we have a difficult time getting answers from or getting anything in writing. And all of a sudden, the property owner completely did a 360 and changed what they're going to do.* And we have plans that aren't approved and—

Q. You have reviewed the agreement you've been talking about that—

A. Yes.

R.R. at 40a–41a (emphasis added).

In short, the express language of the Agreement between Developer and the Township, R.R. at 61a–66a, and the SEO's testimony regarding the Agreement, R.R. at 40a–41a, provide substantial evidence for the Supervisors' determination that Developer previously agreed to construct the sewage system at the new, off-site Veronia Lane location. Concls. of Law Nos. 8–10. The significance of the Agreement is that the Township granted Developer preliminary land development approval for the new Dunkin' Donuts with the understanding that Developer would construct the new, off-site sewage system. R.R. at 61a. As explained more fully below, in so doing the Township voluntarily reduced its options for final plan approval in reliance on Developer's promise to construct the new, off-site sewage system. R.R. at 63a. Thus, the Supervisors did not abuse their discretion in determining Developer's sewage repair permit application was inconsistent with the parties' Agreement.

More significantly, we discern no abuse of discretion in the Supervisors' determinations concerning the impact of Developer's *revised* final land development plan. The Supervisors determined Developer's *revised* final plan conflicted with its previously approved preliminary plan as well as its approved sewage planning module, both of which govern the development of the Dunkin' Donuts-enhanced Regency Plaza. The Supervisors also deemed Developer's revisions to its final plan important because the *revised* final plan does not provide for sufficient parking under the Township's ordinances. The record reveals ample support for these determinations.

More particularly, the record indicates Developer received preliminary land development approval in 2007. R.R. at 61. Through its approved preliminary plan, Developer proposed to locate a sewage system at the new off-site location as well as off-street parking at the location of the

malfunctioning sewage system. *Id.* Consistent with its preliminary plan, Developer submitted a sewer planning module for the new off-site location, which DEP approved. R.R. at 61a–62a; N.T. at 20.

Nevertheless, Developer submitted a *revised* final plan that substantially deviated from its approved preliminary plan and sewage planning module. N.T. at 68–69. Through its approved preliminary plan, Developer proposed off-street parking in the location of the malfunctioning sewage system, and it proposed to construct a new, off-site sewage system. N.T. at 74. However, Developer submitted the *revised* final plan in which it proposed to repair the malfunctioning sewage system, thereby eliminating the proposed off-street parking for that area. R.R. at 58a. Developer's *revised* final plan indicates that, with this alteration, Developer's proposal lacks the required minimum number of parking spaces. R.R. at 91a.

The Supervisors properly determined that Developer's approved preliminary plan governs the site layout. *See* Section 508(4)(i) of the Pennsylvania Municipalities Planning Code (MPC) [5] ("when a preliminary application has been duly approved, the applicant shall be entitled to final approval in accordance with the terms of the approved preliminary application as hereinafter provided."). Under Section 508(4)(i) of the MPC, preliminary approval sets the bounds for final approval, because once preliminary approval is granted, the applicant is entitled to final approval in accordance with its terms. 2 ROBERT S. RYAN, PENNSYLVANIA ZONING LAW AND PRACTICE, § 11.2.3 (2007). The Supervisors did not abuse their discretion in refusing to issue the sewage repair permit in light of the fact that Developer had no approved land development plan of record that was consistent with its repair permit application. This is particularly true in light of the fact that Developer's *revised* final plan acknowledges a violation of the minimum parking space requirement set forth in the Township's ordinances.

Additionally, the SEO deemed Developer's sewage repair permit application incomplete because she did not receive any information on the status of Developer's state permit application from DEP. At hearing, the SEO explained the difficulty in processing Developer's repair permit in light of the previously approved sewage planning module for the new, off-site location. On that point, the SEO testified:

Q. Did you continue to process the application from [Developer]?

A. I sent my first incomplete letter.

Q. What was incomplete?

A. At that point ... [Developer] hadn't come to the planning commission with [its] updated plans.

Q. You're referencing the land development plan for the Dunkin Donuts?

A. Right. So I thought that they were trying to base it on that plan, so *what I really was requesting of them was ... something from the State that said the other permit and the other planning module, what the status was. You can't have two permits for one piece of property. So I was requesting ... some kind of documentation that if they were going to abandon that plan that there was something on the record that that part was now dead.*

R.R. at 20a–21a. In light of Developer's failure to provide the SEO with documentation regarding the status of its approved sewage planning module, the Supervisors did not abuse their discretion in determining that the SEO properly deemed Developer's application incomplete on this basis.

---

**5.** Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 10508(4)(i).

Concl. of Law No. 16. Given the existence of Developer's application with DEP for the new, off-site sewage system, and the lack of documentation regarding its resolution, the SEO's reluctance to issue a repair permit for the same property was reasonable.

This is not to say that Developer is forever chained to its initial plan for an off-site sewage system. However, Developer must: 1) document formal withdrawal of the approved sewage planning module containing the off-site system; 2) obtain approval of a revised preliminary land development plan for Regency Plaza showing a) the now-existing Dunkin Donuts, b) the on-site sewage system it proposes to repair, and c) sufficient parking; and 3) come to terms with the Supervisors regarding the future of the Agreement.

Based on the foregoing, we discern no abuse of discretion in the Supervisors' denial of Developer's appeal of the SEO's refusal to issue the sewage repair permit. Accordingly, we reverse the trial court's order and reinstate the Supervisors' decision.

### ORDER

**AND NOW,** this 15th day of June, 2011, the order of the Court of Common Pleas of Monroe County is **REVERSED.** The decision of the Chestnuthill Township Board of Supervisors dated December 15, 2009 is **REINSTATED.**